Good morning, Your Honor. May it please the Court. Melanie Sedam, counsel for the Plaintiffs' family of Russell Cotton. In November 2002, Russell Cotton, who was on a Section 5150-72 hour psychiatric hold, was wrongfully arrested and taken to the Santa Barbara County Jail. Other than the designated acute psychiatric care facility. Are you challenging the probable cause basis for his arrest under 594 PC for kicking the window out of the mental health assessment team vehicle? Yes, he did kick the window out of the car, Your Honor, but all of the arresting officers testified that they did not feel the arrest was appropriate. But that's not my question. Did the officers have probable cause to arrest him or not? Whether or not they would want to exercise that discretion is a different question. Well, under the circumstances of the case, Your Honor, we feel that there wasn't probable cause. I mean, it happened in their presence and they watched him destroy county property and vandalize the car. I don't understand how that, as a matter of law, that could not be probable cause. Well, probable cause is generally an issue for the jury who looks at the circumstances. No, it's a question of law. And it's a predicate for the false arrest claim that then gives rise to potential civil rights liability. So, I don't think that's a fact issue, counsel. Nonetheless, Mr. Cotton was taken to the jail rather than the psychiatric facility. The decision to take him to the jail seemed to be predicated on an understanding that the psychiatric facility staff, after accepting Mr. Cotton for acceptance at the facility, then withdrew their permission for Mr. Cotton to be brought to the facility. Was that because of the fact that there were only two female nurses on duty and he was still combative and fighting when he arrived? Actually, according to the testimony of staff at the facility, there were sufficient staff available to accommodate Mr. Cotton, even though he was aggressive. There apparently was another facility that the MAP technician was considering that only had the two women available and he was not willing to take Mr. Cotton there. And was that the county PHF facility, the psychiatric health facility? No, the county psychiatric facility said that they were really willing and able to take Mr. Cotton, despite the fact that he exhibited some aggression. And this is an area where we have a factual dispute, because the MAP technician indicated that he was being told by the psychiatric facility not to bring Mr. Cotton. And that was the only reason that the officers arrested Mr. Cotton, because they thought that jail was at least an option where he could get psychiatric care. Wait a minute, I thought there was a 5150 mental health hold that had been placed on him by the mental health professionals, was there not? Yes, that's correct. And there was probable cause to arrest him for the crime. So I'm not sure what the basis of your civil rights claim is, that they took him to jail instead of to the mental health facility? Right. Where's the constitutional violation there? Well, putting the arrest aside. But assume for the sake of my questioning that there is probable cause to arrest him. I concede that he did break the window and that the officers could arrest him for breaking the window. But I'm going past that. They arrested him because the psychiatric facility, at least they were told, would not accept him. This is in contravention of the mandate of 5150 and is a denial of Mr. Cotton's right to psychiatric care. So that's a statutory violation. I'm struggling with the constitutional right there. This is a Federal civil rights case. That's correct. What constitutional right is implicated if, for whatever reason, the officers decide to take Mr. Cotton to jail rather than to a psychiatric facility? Well, Mr. Cotton had a right to psychiatric care as a result of being put on a 5150. But that's a statutory right. What provision of the Constitution are we talking about here? The county's denial of his right to psychiatric care by refusing to accept him at the psychiatric facility, this turned out to be a disputed fact because, on the one hand, the MAT personnel are saying they were told not to bring him. On the other hand, the psychiatric facility personnel were saying, no, that never happened. So this was a factual issue in dispute that was never resolved. You know, you spent almost half of your time on this false arrest provocation. You've gone to jail. And I think it would be better ñ I guess what I'm more interested in is this excessive force claim and whether summary judgment was appropriate, given that there is some disputed facts in the record on, I guess, both excessive force and the constitutional right to adequate medical treatment. So could you please address what genuine issues of material fact as to the excessive force claim that you introduced that would defeat summary judgment at this stage? Right. Well, once Mr. Cotton was at the jail, he presented with both psychiatric symptoms and respiratory symptoms. He asked for breathing treatment, was denied that breathing treatment. He was told he would have to wait an hour. A person in Mr. Cotton's condition, which was COPD, chronic obstructive pulmonary disorder, really can't wait an hour for breathing treatment. He was being relocated after seeing the psychiatrist, who did absolutely nothing to either diagnose him or treat him, to another area of the jail. He was handcuffed in front. While he was walking toward the area that he was supposed to be housed, he turned around and started walking back the way he had come. Officer Martinez told him to stop, and when Mr. Cotton kept walking, he slammed him into the wall. There is a... Now, is there a dispute in the evidence as to when Mr. Martinez slammed him into the wall or the circumstances of that? And if so, what is it? When it happened? Like, how it happened, when it happened, if it happened. Well, how it happened was Mr. Cotton was walking several feet in front of the officers. He had been asking for breathing treatment before they left the dressing area. He turned around and started walking back toward the dressing area. He was told to stop, but he kept walking. At this time, Officer Martinez pushed Mr. Cotton into the wall hard, he admitted. There is a disputed issue about whether there was any provocation. Mr. Martinez testified that Cotton was simply walking and then he pushed him into the wall because he wouldn't obey his order. There was disputed testimony from Officer Chobanoff. This disputed testimony was never resolved. Once...  What was the dispute in the testimony? Well, Officer Chobanoff testified that when Mr. Martinez grabbed Mr. Cotton's arm, Mr. Cotton pulled away and that was what provoked Mr. Martinez to push Mr. Cotton into the wall. Is it your position that once Mr. Cotton turned and started walking back in the opposite direction from where the correctional officers were moving him, that they were not privileged to use any force at all in order to get him to go to the safety cell where they were trying to move him to? I'm saying that the force they did use, slamming him into the wall, was inappropriate. Okay, so do you agree that some force might have been appropriate at that point, but you think the amount that they used was inappropriate? Yes. Is that what the dispute is over? Yes. And what could the officer have done besides putting his hands on Mr. Cotton to make him go in the direction that he wanted him to go? Well, one of the problems here is Mr. Cotton had been demonstrating a great deal of paranoia. He had expressed that he was afraid officers were trying to kill him. And, in fact, he'd actually been threatening Officer Martinez shortly before telling him he was going to kill him. That's correct. But Mr. Martinez testified that he did not feel threatened. He simply saw Mr. Cotton's behavior as mouthing off, and he was actually able to talk to him verbally to get him to follow his commands. And Mr. Cotton was, in fact, cooperative with Officer Martinez. It wasn't until he was slammed into the wall that Mr. Cotton started struggling. At this point in time, two other officers came, and by pulling Mr. Cotton's legs out from under him, they got him to the floor. He continued to struggle. At some point in time after this, one of the officers who had him on the floor, Officer Travis, called a Code 4, which meant that everything's okay. Nonetheless, three other deputy sheriffs who were walking by saw the altercation on the floor, and they came and they joined the melee. Well, at that point, was he still struggling when they had a hold of each of his arms and legs? Yes. Okay. And so is it your contention that they were not privileged at that point to continue holding onto his arms and legs to carry him into the safe? I think that once the Code 4 was called, that it certainly indicates that no other officers were necessary to control the situation. That wasn't the question I asked. I guess I'm trying to understand what your theory of excessive force is at this point. Is it your position that as a matter of law, it was unconstitutionally excessive under the Fourth Amendment for the officers to carry him by his arms and his legs while he was still fighting to get him into the safety cell? Well, now that they're carrying him, there's a couple of events that occurred before that. Is he still handcuffed at this point? Yes, he's handcuffed the entire time. And he's having problems breathing? Pardon? He's having problems breathing? Yes, he is. When he was taken down to the floor, he told the officers he needed to see a doctor. The officers were already aware, at least Martinez was, that he had been requesting a breathing treatment before even being moved. As they were carrying him, he kept yelling, I can't breathe, I can't breathe. The only response the officers had was to tell him if he could yell, he could breathe. Our experts presented evidence that demonstrated that a person with COPD can very well yell and still not be able to breathe because what is happening is air is moving in and out, but the patient, because of his disease, is not getting any oxygen. A council district court said that after the struggle with the exceedingly combative decedent in the safety cell, the defendant officers involved had no reason to believe, in light of his consistent yelling, that he was experiencing respiratory problems. But later, after discovering the condition, they contacted 911. Now, you are saying that the finding is they had no reason to believe, in light of his yelling, that he was experiencing respiratory problems. Well, the only way they could have no reason to believe that he wasn't having respiratory problems was if they completely ignored his cries for help. And so he was saying, I can't breathe, I can't breathe. Yes. Or at least there's a disputed issue of fact as to that. That's correct. That's my problem with that finding, is that it seems as though you had put in that expert declaration that he could both yell and be unable to breathe in the sense of getting oxygen. That was before the court? Yes, Your Honor. Dr. Kaplan testified that a person with COPD can move air in and out, and that, unfortunately, the faster this type of person breathes, the less oxygen they are actually getting. And so while they are yelling, they are actually losing oxygen. And that this is even accelerated because of the excitement of the altercation, the adrenaline that's flowing, all of these factors create a situation where the oxygen level drops. The officers wouldn't necessarily know that, have access to that expert opinion at the time. But what you're saying is that the fact that he was yelling, that he was in trouble, they should have paid some attention. Yes. And the expert really went into great detail about how it was, in fact, possible for these two things to coexist, yelling and not getting enough air. These pleas were ignored. He was taken into the safety cell and ultimately put in a four-quarter restraint where he was lying on his stomach and his arms and legs held behind his back. The district court also found that he had requested his breathing medication, too. Right, that was before he was even moved. He was held in a four-quarter restraint until he totally stopped moving. And when the officer finally let him go, he was mumbling incoherently. This is according to the testimony of Officer Coburn. As soon as the officers left the room, it was apparent Mr. Cotton was in trouble. Heliodoro Martinez testified that as soon as the officers got out of the way, and he was working the monitors upstairs, he could see that Cotton was in trouble. Officer Avila, when asked what happened after the handcuffs and they were leaving the room, he explained how the officers were leaving. Well, in that context, he was asked what color Mr. Cotton was, and he testified he was purple. Now, later, he testified that, well, he didn't notice the purple until after he came back in the room. But we have that conflict of him testifying both that he saw it when he was leaving, and then again later when he came back, that conflict was not resolved. And those few minutes were critical to Mr. Cotton's life, because at that moment, he was asphyxiating beyond the point of return. And our medical experts testified, the forensic pathologists, that Mr. Cotton died of restraint asphyxia. You have about two minutes left, if you want to... I'll reserve that for everybody. Counsel, before you introduce yourself, I think that I at least would appreciate your concentrating your argument on the excessive force and lack of adequate medical care claims. I would be glad to do that, Your Honor. Thank you. Thank you. Before I turn to that excessive force, I just would like to point out to the Court that the conflict that Counsel just mentioned about the purple face, it doesn't exist. If you read the pages of the transcript, only in Counsel's mind is there this conflict about seeing purple on the face of Mr. Cotton walking away for a couple minutes and then coming back. If you read his comments, he says, Counsel, it's just not there. It wasn't there when we argued it below. The record hasn't changed. In fact, the record doesn't support most of what Counsel has just told you. Turning to the excessive force, and I guess it seems like we're not even talking about the same event when we talk about this case. I think all of the members of the Court have probably cited to the language from Graham repeated in a lot of cases that not every push or shove, even if it may later seem necessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. Judge Friendly wrote that over 35 years ago in Glick v. Johnson. Now, I may have been using the wrong standard, at least Justice Rinko said so later in Graham, but the sentence before that was what Justice Glick was talking about was a conflict with a pretrial detainee in a jail, and he said, the management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force, not every push or shove, and he goes on. We're in a jail. Location and timing are two things. Now, I think I've probably been speaking for approximately two minutes now. Two minutes is from when Mr. Cotton screamed no, spun, and took off until he was placed in the safety cell and all four officers exited. Two minutes for the entire incident. Location is important here, because as counsel conceded, and Judge Justice Holm pointed out... May I just interrupt for a second? Yes, ma'am. You just told us that there's no conflict in the record on when Avella saw the purple face? Yes. Well, I have citations to the record where there is a conflict on that. Page 95 of the transcript says when he went back. Well, no, no, there's conflicts in the record on that. And it goes to my question. I mean, I'm concerned that the proper standards of summary judgment weren't applied to the excessive force and the deliberate medical indifference claims in this case. It seems to me that there were conflicts as to material issues that the district court put themselves in the role of finding them back. Instead of viewing all the evidence in the light most favorable to the plaintiffs, it seems to me that the district court just found the facts, because Avella did testify that, I guess it was under cross-examination, that he saw discoloration in Cotton's face when he was leaving the room in his deposition. And then later he testified, well, later he said, when we exited the cell, I looked back and noticed the discoloration. So there is a lot of inconsistencies on this. Now, is that important? I mean, at that point, should they have immediately done something to get the breathing apparatus to this man who they knew was having problems breathing? Let me address that. When they were first in the dress-in, Mr. Cotton said, I want my medication. Now, you have to understand, Mr. Cotton had been in and out of jail for the last few days. He had been dealt with by the jail nurses who are not parties to this lawsuit. The officer, Officer Martinez, when Mr. Cotton says, I want my breathing treatments, immediately goes outside, calls the nurse, Nurse Biro, and says, I have a man here, Mr. Cotton. He says he needs his breathing treatments. He's told, we're aware of it. When you get him over here to Northwest, we'll give him his breathing treatment. He goes back in. He tells that to Mr. Cotton. They're in a confined space. Mr. Cotton then gives him some talk, back talk, but eventually agrees to put his shoes on, get his handcuffs on. The phone call was at 2.30. They start walking out and heading over to Northwest. As they're heading towards Northwest is when Mr. Cotton spins. There's the push. A total of two minutes takes you from when he goes, when he spins until he is, the officers leave the safety cell. In that two minutes, because he's going into a safety cell, they have already notified the medical providers at the jail to come. As soon as Mr. Avila noticed that he had, appeared not to be breathing or labored breathing, he then did another call to the nurses. They came running. The nurses then opened the medical facility there and put the air on the mask on his face. So the safety cell was located in the Northwest section. No, there's a diagram in 37. The safety cell happens to be 31 feet from where the incident occurred. Once Mr. Cotton started struggling and carrying on and screaming, four officers pick him up. They can't deal with him in this open hallway. I'm sorry, I didn't make my question clear. Was it the nurse's intention to go to the safety cell and administer the breathing treatment there? Once you go into a safety cell, the nurses are immediately notified and they come, whether there's a problem or not. The policy is the nurses have to come once you go into the safety cell. So while he's being put down in the safety cell, they're already being called to come, not because there's a perceived problem, just because he's going into the safety cell. A minute later... Counsel, you and I are talking past one another. It's a real simple question. I apologize. When Correctional Officer Martinez called the nurse from dress-in and said Mr. Cotton says he needs a breathing treatment, and the nurse said, okay, I'll get him a breathing treatment, was it contemplated that that treatment would take place after Mr. Cotton was placed in the safety cell? Would she go to the safety cell to administer the breathing treatment? No, at that point he was being taken to Northwest, and that's where the breathing treatment would be administered, a different part of the jail. But it was because the fight broke out and he wouldn't go to Northwest that they decided to put him in a safety cell instead? Correct. I got you. And that's because you have a struggling inmate, they need to put him back into a place, they can't have him out in the hallway. Isn't that another conflict in the record? Because, you know, having done some of these excessive force cases in a trial, the level of resistance that Cotton gave versus the amount of force that was justified by Mr. Martinez to control him, it's unclear from this record. Martinez took hold of Cotton's arm to stop him, and you don't cite any evidence, and then it says that then Cotton got angry and started struggling. But the blue brief says when Cotton, without any struggle, without any altercation or fighting, he simply turned around and walked in a different direction from Martinez, that Martinez slammed him against the wall, and that's supported by some statements by Martinez. I think at the record at 1833 to 1835, I believe it's Chobunov says that, Chobunov being the traitor, says he spun around, and I wouldn't say running, but he was moving quickly away from us, Martinez reached out. Martinez says that he reached out, he tried to hold, push Cotton against the wall to restrain and contain him. He didn't, that restraining and contain becomes an assault in plaintiff's brief. No one ever used the word assault, no one ever used the word attack. They used the word slammed something like 17 times. No one at any deposition ever used the word slam. It wasn't until their expert put it into a declaration. Didn't Martinez testify in his deposition when he was asked, Martinez testified that Cotton turned around and started moving back the way they had come, and he was asked in his deposition, what did you do, to which he responded, to better control him, I pushed him against the wall? Correct. Okay, well, isn't that a question of fact, whether that force was excessive? If you take the facts in the light most favorably to Cotton, and accept that all he did was turn around and walk away from Martinez. No, not in the context of a jail, as I started off with that quote by Justice Friendly, is that in the context of a jail, you are taking someone in an open corridor. So you're saying as a matter of law, but this is not a factual question. As a matter of law, in the context of a jail, if a prisoner doesn't do exactly what you want, you can push him into the wall. As a matter of law, if a inmate who is being transported from one section to another, at some point spins around, screams no. That's taking the evidence in the light most favorable to you. It's not taking the evidence in the light most favorable to Cotton. The evidence, there is no contrary evidence that he spun around, that he screamed, and that he was pushed into the wall. There is no other evidence. But plaintiffs have no other evidence concerning that. They have the testimony of Chobanow, the testimony of Martinez. They have Guerra, who was the classification officer. And if you take all of their testimony, it is consistent. There is no disputed fact about the amount of force. The question then becomes whether it was excessive force. Right. And can you, under these circumstances, looking at the evidence in the light most favorable to the plaintiff, how can you say that they haven't created, I mean, that we can decide that as a matter of law? Well, in Graham, they grabbed the person, dragged him out of the audience, took him to his car, and when they put him into the van, they wrapped his head against the top of the van. They said that that was not excessive force. But that was kind of accidental. They didn't shove him up there in that case. I mean, that was kind of an accidental use of force, and that was the reason for the quotes you're giving, is that, you know, at some point, these things are going to happen. But when it's excessive in the sense of being beyond the appropriate measures that should be taken by the officers, then that's what creates the constitutional violation. And in this case, there is no evidence that the push against the wall caused Mr. Cotton any injury whatsoever. No evidence. He was simply restrained and contained. It seems to me that if you ask a reasonable officer, what would you do in that context? What else can you do with someone who has been acting out, has been threatening, and now screams no and turns around? Simply putting a hand on at that point to restrain and contain him I submit is not excessive force. But that's even contrary to what Martinez testified later. He said that he reached out to grab Cotton. So that would be a level of force that would be less than pushing him against the wall. Excuse me. I believe, Your Honor, that when he talks about reaching out to grab, we're talking about a split-second decision. And when he reaches out to grab and tries to get a hold of him, he is also trying to, if you look at the Exhibit 37, push him against the wall because the wall is right there. The corridor is like eight feet wide. They're walking him along. It's the area where all the inmates that are being booked in, all the arrestees come through. He's simply trying to pin him against the wall, as did Guerra testified, that that is sort of a standard procedure to restrain and contain someone. So is your position that in the context of deciding whether qualified immunity attaches in an excessive force case, if we know the amount of force that was used, then does the court have the authority to declare as a matter of law that under these circumstances it would not be a constitutional violation for a reasonable officer to employ that level of force in order to control Mr. Cotton? Is that what you're saying? That is what I'm saying. I'm saying that if you balance the intrusion, which was putting your hand on his arm and pushing him against the wall, so that you balance that intrusion on Mr. Cotton versus the governmental interest in a penal setting of controlling inmates, moving them from one point to another, and not allowing them to drop their things, scream, spin, and take off someplace in the jail, it would be different, I submit, Your Honor, if in the context of an enclosed cell, you tell Mr. Cotton to do something. What about the evidence that's currently in dispute about what happened in that closed cell and when Mr. Cotton stopped breathing? And once again, Your Honor, there is, I don't believe, if you look at, if you read the record, there is no ---- Well, I assure you, not only have I read the relevant portions of the record, my law clerk has read the entire record. So what I'm talking to you about are things that are in the record. In the record, I believe that Turner testifies that the legs go up at 90 degrees. And I have to admit, it did not make it easy to review this case because there were no citations in the blue brief. And so it did require us to do a tremendous amount of work to come to the record. I believe that in the record it indicates that Turner was holding the legs and they were at a 90 degree. Our position, he was never in a four-quarter restraint. They brought him in, they put him down, they undid the cuffs, and one by one they exit the cell, and all of that takes place under two minutes. I think we're back to where we were. I believe Mr. Stoddard's argument makes it very clear that there were a number of critical issues in dispute, issues that go to whether or not excessive force was used, whether or not Mr. Cotton was denied medical care, whether or not medical care was delivered timely, and whether or not after all of that the officers might have been entitled to qualified immunity. Let me ask you the same question I asked Mr. Stoddard. Is it your position that in an excessive force case we can never grant summary judgment because excessive force is always a question of whether or not the amount of force employed was reasonable? It's our position that under the circumstances of this case that whether or not there was excessive force was a question of fact for the jury. So you would concede that there might be appropriate cases where, notwithstanding the fact that an excessive force claim is made, qualified immunity can still nonetheless be granted? I can only address what Mr. Stoddard said. Isn't Saussure v. Katz an example of a case where the challenge was to the excessiveness and the Supreme Court said qualified immunity applied in that case? Hoggins v. Brousseau where a person was shot fleeing the scene. Chavez v. Martinez. But here we have disputed issues. Whether or not the force was excessive. We had over 150 disputed facts, most of which dealt with the excessive force and medical issue. There were 30 issues that the district court had to resolve in order to give the county summary judgment as a matter of law. The only way that could have happened was if the district court had weighed the evidence. This is not the role of the court in a motion for summary judgment. I think we understand and you have used your time. Thank you. Thank you. The case just argued is submitted for decision.
judges: Schroeder, Wardlaw, Tallman